William F. AUSTIN, Chief Insurance Commissioner of South Carolina, as Receiver for National Fidelity Insurance Company, Title Insurance and Guaranty Company and Cudd & Coan Underwriters, Inc., and also as Trustee for Atlantic Mutual Fund, Appellant,

v.

NATIONAL DISCOUNT CORPORA-TION, Bankrupt, Appellee.

No. 8979.

United States Court of Appeals Fourth Circuit.

Argued June 5, 1963.

Decided Sept. 4, 1963.

T. Emmet Walsh, Spartanburg, S. C., and J. Monroe Fulmer, Columbia, S. C. (William H. Smith, General Counsel, South Carolina Insurance Department, Frank A. Lyles and Robert L. Stoddard, Spartanburg, S. C., on brief), for appellant.

Neville Holcombe, Spartanburg, S. C. (T. Sam Means, Jr., and Robert F. Chapman, Spartanburg, S. C., on brief), for appellee.

Before BRYAN and J. SPENCER BELL, Circuit Judges, and BARKSDALE, District Judge.

J. SPENCER BELL, Circuit Judge.

This appeal is brought to set aside a decision of the district court holding that a subordination provision in a debenture bond issue be enforced as written.

National Fidelity Insurance Company, Title Insurance and Guaranty Company, Cudd and Coan Underwriters, Inc., and Atlantic Mutual Fund are presently under the receivership or trusteeship of the Chief Insurance Commissioner of South Carolina. Ownership and control of these organizations has been, in varying degrees and through various corporate arrangements, interrelated with that of the National Discount Corporation, Bankrupt. It is alleged that those in control of the organizations currently under the receivership or trusteeship of the Chief Insurance Commissioner, caused them, in a manner unjust and inequitable to their creditors, to purchase a large portion of the subordinated debenture bonds of the National Discount Corporation. The provisions of the subordination agreement of these bonds are such that their holders are subordinated to over two million dollars of bank loans.

It is the Commissioner's position that because of the inequitable and unjust manner in which these bonds were foisted upon the organizations he currently represents, and because the banks claiming priority knew, or from information in their possession should have known, of the suspect nature of the debenture transactions, the subordination provisions should not be enforced. He further contends that the subordinated debenture transactions were ultra vires the authority of both the bankrupt and the organizations he represents, and are, therefore, void.

The district court found that the lending banks advanced the funds to the bankrupt in reliance on the subordinated nature of the debentures, and that they neither knew nor had sufficient information so that they should have known of the suspect nature of the debenture transactions. He enforced the subordination agreement, thereby granting priority to the debts due the banks. The court did not pass on the issue of ultra vires, apparently because it was not presented to him.

**I**

General Orders in Bankruptcy 37, 11 U.S.C.A. following § 53 provides that the Federal Rules not inconsistent with the Bankruptcy Act or with the General Orders shall be followed in bankruptcy "as nearly as may be". In reviewing the findings of fact of the district court, where there has been no decision by the referee, we are bound by the clearly erroneous rule of Fed.R.Civ.P. 52(a). Cf. Small v. Williams, 313 F.2d 39 (4 Cir. 1963); Potucek v. Cordeleria Lourdes, 310 F.2d 527 (10 Cir. 1962), Cert. denied, 372 U.S. 930, 83 S.Ct. 875, 9 L.Ed.2d 734 (1963); Employers Mutual Casualty Company v. Hinshaw, 309 F.2d 806 (8 Cir. 1962); Mountain Trust Bank v. Shifflett, 255 F.2d 718 (4 Cir. 1958); General Order in Bankruptcy 47, 11 U.S.C.A. following § 53. A thorough review of the evidence does not convince us that the district court's findings are reversible. There is no evidence which makes clearly erroneous his finding that the banks did not know, either actually or constructively, who owned the bonds in issue.

The record makes it clear that it is the general business practice of finance companies, such as National Discount Corporation, to borrow large portions of their working assets from banks. The lending banks, in deciding the amount they will permit the finance company to borrow, rely to a large extent on the amount of capital invested in the finance company. In determining the amount of invested capital, these banks include long term indebtedness that will be subordinated to the loans the banks will make. This is based on the realization that the sale of such subordinated debt, as does the sale of capital stock, swells the amount of assets of the finance company available for operating use without increasing the amount of debt that will share the available assets on a parity with the banks in the event of bankruptcy.

The evidence supports the conclusion that banks as a regular practice in dealing with a borrower do not seek to deter-

mine the names of the holders of debentures subordinated to their loans. The Commissioner, however, sought to prove several facts which might tend to indicate that the banks actually knew, or should have known, who owned the bonds. The district court failed to draw the inferences the Commissioner suggests, and we do not find the court's conclusion clearly erroneous.

The Commissioner first showed that at least some of the banks required a *sub rosa* agreement to maintain compensating balances [1] before they would grant the loans, and that in some cases the compensating balances were maintained by the interrelated corporations involved in the instant case rather than by National Discount Corporation. He further showed that many documents submitted to the banks by National Discount Corporation listed some of the organizations involved here as affiliates. This evidence shows clearly that at least some of the banks knew of the interrelation of the several corporations, but, as the banks point out, and the district court apparently found, it does not prove knowledge of ownership of the debenture bonds.

The Commissioner then proved that some of the banks loaned money to the corporations he represents and were, therefore, in possession of their financial statements. However, the evidence introduced by the banks indicates that because of the relatively secured nature of these loans the financial statements required were not extensive, and did not disclose the names of the issuers of debentures these corporations owned.

The Commissioner further showed that one of the principal assets listed on the bankrupt's statement was the stock of Title Insurance and Guaranty Company —one of the companies which he represents in this action. He argues that an investigation of this asset, which was so important to the bankrupt's financial status, would have led the banks to the books of the Insurance Company, which would in turn have disclosed it to be the holder of the bankrupt's subordinated debentures. However, the evidence clearly shows that the banks did not in fact investigate the asset and, therefore, had no knowledge of the ownership of the subordinated debentures. Furthermore, an examination of the bankrupt's certified financial statement upon which the banks testified they relied shows that other assets listed thereon were sufficient in case of insolvency to liquidate the bank loans provided the subordination provisions of the bonds were honored.

Finally, the Commissioner showed that the banks had knowledge of severe losses suffered by National Discount Corporation which did not show up on subsequent financial statements. Apparently the Commissioner contends that because of these known losses and the bankrupt's failure to disclose them on its financial statements, the banks should have either ceased permitting the bankrupt to borrow money, or conducted an investigation of the bankrupt's financial status which would have disclosed the names of the owners of the debenture bonds. However, the evidence indicates that the banks made no such investigation but instead continued to lend money to the bankrupt, because of an apparently reasonable explanation given for the failure

---

1. A compensating balance is generally a deposit maintained in the lending bank by the borrower. Kept at a flexible percentage of the loan, the effect of the compensating balance is to increase the security of the lending bank and at the same time to increase the effective rate of interest the lender is receiving. Although generally no specific agreement to maintain a compensating balance was entered into, this was often understood by all concerned as a requirement. One of the bank's witnesses testified, after denying that compensating balances were required, that "if they had come in and said we want to borrow some money and they were not a depositor of ours, I would have said in all probability, well, where do you do your banking business; if they had said Mr. Brawley's bank, I would have said, I suggest you go down and see what you can do with Mr. Brawley".

of the loss to be reflected on the financial reports.

As this brief review of the extensive evidence indicates, the findings of fact of the district court are not clearly erroneous, and we cannot set them aside.

Our discussion of the facts supporting the district court's decision that the banks had no knowledge of the bankrupt's improper conduct is not intended to indicate that a contrary conclusion would have required a different result than that reached by the court below. It is to be noted that subordination provisions such as those in the instant bond have been almost universally enforced by bankruptcy courts, in the absence of circumstances making such enforcement inequitable. Bird & Sons Sales Corporation v. Tobin, 78 F.2d 371, 100 A.L.R. 654 (8 Cir. 1935); Bank of America Nat. Trust & Savings Ass'n v. Erickson, 117 F.2d 796 (9 Cir. 1941); In re George P. Schinzel & Son, 16 F.2d 289 (S.D.N.Y. 1926) (L. Hand, J.); Elias v. Clarke, 143 F.2d 640 (2 Cir. 1944); Cert. denied, 323 U.S. 778, 65 S.Ct. 191, 89 L.Ed. 622 (1944); In re Aktiebolaget Kreuger & Toll, 96 F.2d 768 (2 Cir. 1938); In re George C. Bruns Co., 256 F. 840 (7 Cir. 1919); Searle v. Mechanics' Loan & Trust Co., 249 F. 942 (9 Cir. 1918), petition for cert. dismissed, 248 U.S. 592, 593, 39 S.Ct. 67, 63 L.Ed. 437 (1918); Cf. Prudence Realization Corp. v. Geist, 316 U.S. 89, 62 S.Ct. 978, 86 L.Ed. 1293 (1942). Although creditors may not reap the fruits of transactions in which they have joined with the debtor to defraud other creditors, In re Friedman, 164 F. 131 (E.D.Wis.1908); Cf. Zavelo v. Reeves, 227 U.S. 625, 33 S.Ct. 365, 57 L.Ed. 676 (1913), they are not generally held to be fiduciaries of other creditors, and are not held to a higher ethical standard than that required by market place morals. Rader v. Boyd, 252 F.2d 585 (10 Cir. 1957); Crowder v. Allen-West Comm. Co., 213 F. 177 (8 Cir. 1914), affirming, In re Hawks, 204 F. 309 (E.D. Kan.1913). However, we expressly take no position on the matter.

II

In the absence of knowledge by the banks, either actual or constructive, of the suspect nature of the subordinated debenture transaction, we can see no equitable basis for refusing to enforce the subordination provision in the instant case. It is to be noted that the Commissioner has not and does not now seek rescission of the bond transaction. His decision not to do so is apparently based on the relative valuelessness of some of the assets transferred in exchange for the bonds.

III

The issue of ultra vires was apparently not presented to the court below. At any rate, as the receiver does not desire to return the benefits received under the debenture agreement in exchange for the assets that were transferred to the bankrupt, but is rather attempting to enforce the bonds without the subordination provision, this claim has no merit. Williamson v. Eastern Building & Loan Ass'n, 54 S.C. 582, 32 S.E. 765 (1899); Lancaster v. Southern Life Ins. Co., 89 S.C. 179, 71 S.E. 864 (S.C.1911).

Affirmed.